**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI
KANSAS CITY DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INTERSTATE BAKERIES | ) Case No. 04-45814-can |
| CORPORATION, et al., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| US BANK NATIONAL ASSOCIATION, in its capacity as Trustee of the IBC CREDITOR'S TRUST, | ) ) ) |
| | ) Original Adversary Proceeding No. 06-04191 |
| Plaintiffs, | ) |
| | ) |
| v. | ) Bifurcated Adversary Proceeding No. 09-04205 |
| | ) |
| Petro Commercial Services Inc. | ) |
| RND Enterprises, LLC f/k/a | ) |
| RND Mechanical Contractors, Inc. | ) |
| Premium Food Sales Inc. | ) |
| Prime Industrial Recruiters, Inc. | ) |
| Public Service Electric and Gas Company d/b/a PSE&G | ) ) |
| | ) |
| Defendants. | ) |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

On the 10th day of April 2013, the Court heard opening statements and took evidence on the remaining unresolved issues with respect to Plaintiff, US Bank National Association, in its capacity as trustee (the "Trustee" or "Plaintiff") of the IBC Creditors' Trust (the "Trust") claims against defendant, Premium Food Sales Inc. ("Premium"). Plaintiff appeared by and through its counsel, Andrew J. Nazar and Brendan L. McPherson of Polsinelli Shughart PC, and in person through W. Terrence Brown, a member of the Trust's Trust Advisory Board. Premium appeared

2386740.4

by and through its counsel, Jeannie M. Bobrink and James F. Freeman of Swanson Midgley, LLC and by telephone[1] through Donald Couture, its principal with Irvin Schein, Premium's Canadian counsel. There were no other appearances.

The Court, after reviewing the Memorandum Opinion of the Honorable Jerry W. Venters, now retired, (Docket No. 97) (the "Opinion on the Trustee's Motion"), the Memorandum Opinion of this Court (Docket No. 123) (the "Opinion on Premium's Motion"), Plaintiff's Trial Brief and Motion in Limine (Docket No. 113), Premium's Suggestions in Support of Motion and suggestions in Support of Disallowance of Interest both pre-and post judgment and Extraordinary means of collection (Docket No. 124), the Order on Plaintiff's Motion to Correct Clerical Mistake, (Docket No. 125) (the "Order Correcting Clerical Mistake"), the stipulation regarding admissibility of certain exhibits (Docket No. 128), reviewing the Court file, hearing the statements of counsel, considering the admitted exhibits and testimony and credibility of the witnesses, and being otherwise duly advised in the premises, FINDS, ORDERS AND ADJUDGES as follows:

### I.    BACKGROUND

1.    In this bifurcated adversary proceeding initiated in 2009, the Trustee seeks to recover a portion of $412,240.00 in allegedly preferential transfers (the "Transfers") that the Debtor made to Premium in the 90 days before the Debtor's bankruptcy petition date.

2.    Following the Trustee's Motion for Partial Summary Judgment (Docket No. 82) and briefing on the matter, the Honorable Jerry W. Venters, now retired, entered his Opinion on

---

[1] The Court allowed Mr. Courture to testify by phone as he was sworn in on the record by a court report in the room, Mr. Schein, Premium's attorney established it was Mr. Courture speaking and Plaintiff consented to the procedure.

2

2386740.4

the Trustee's Motion, granting the Trustee's Motion in all respects. The effect of which, as summarized in that Opinion was that:

> The uncontroverted facts establish judgment as a matter of law that: 1) the Transfers are avoidable under 11 U.S.C. § 547(b); 2) Premium cannot shield the Transfers from avoidance under § 547(c)(1); 3) Premium's ability to shield the Transfers from avoidance under § 547(c)(2) and (c)(4) will be determined at the trial… and 4) any credit for new value will be calculated using the delivery dates and amounts set forth in numbered paragraph 7 [of the Opinion].

3. Later, Premium moved the Court for Summary Judgment, which it later conceded was partial summary judgment. This Court denied Premium's Motion in the Opinion on Premium's Motion, and this matter proceeded to trial on Premium's § 547(c)(2) and (c)(4) defenses. The Court's Opinion on Premium's Motion outlines much of the relevant and binding law with respect to Premium's § 547(c)(2) and (c)(4) defenses.

4. In the Court's Opinion on Premium's Motion, the Court determined that in order to prevail on its ordinary course of business defense under § 547(c)(2), Premium must meet all three prongs of the pre-BAPCPA version of § 547(c)(2). The Court determined that the Trustee had conceded that Premium established the first prong under (A), that the debt was incurred in the ordinary course of Premium and the Debtor's business or financial affairs.

5. The Court also issued an Order Correcting Clerical Mistake, which modified and corrected the chart in Paragraph 7 in the Court's previous Opinion on Trustee's Motion effecting the new value defense asserted by Premium.

3

## II.     FINDINGS OF FACT

**A. New Value**

6.    With respect to Premium's new value defense under § 547(c)(4), the Court admitted Plaintiff's Exhibit 2, a chart titled "New Value Analysis (with no Ordinary Course Defense Considered)" ("Plaintiff's New Value Chart").

7.    Although the Court admitted four charts presented by Premium, based on the Court's review of these charts, and the testimony of Mr. Couture, the Court concludes that none of these charts adequately address Premium's entitlement to a defense, strictly under § 547(c)(4). Accordingly, Premium has offered this Court no evidence of the discount it is entitled to receive solely under the new value defense.

**B. § 547(c)(2)(B) / Subjective Ordinary Course**

8.    Prior to trial, the parties agreed on a Joint Stipulation (Docket No. 128). In the Stipulation, the parties agreed on data relating to the timing of payments for both the 90-day preference period (the "Preference Period") and the approximate nine month period of time prior to the Preference Period (the "Pre-Preference Period").

9.    Premium's sole witness, Mr. Couture, identified and addressed briefly Premium's various exhibits that related to Preference Period and Pre-Preference Period data, including Premium's Exhibits A, C, H-K. The Court admitted each of these exhibits.

10.   The Trustee's sole witness, Mr. Brown identified and addressed Preference Period and Pre-Preference Period data from his Expert Witness Report, admitted by this Court as Exhibit 1.

11.   The Court finds that the substance of the data from the parties' competing exhibits, and the Joint Stipulation is the same. The only difference in presentation of this data

was the "days to pay" or "payment gap" data. The Trustee's presentation of this data, through its witness Mr. Brown, was calculated from the invoice date[2] to the deposit date of a check by Premium. Premium, in its Exhibit C, presented a "payment gap" from the invoice due date (i.e. 15 days from the invoice/shipment date) to the check date and the deposit date.

12. Premium's presentation and analysis of this data was based on several iterations: (i) Exhibit H – is a combination of new value and ordinary course analysis, using the Transfer (Received) Date which Premium estimated based on a two day subtraction of the deposit date of the checks[3] and mistakenly uses the wrong action date to organize its data; (ii) Exhibit I – is the same data as Exhibit H, but uses the Transfer Date (i.e. Check Date) instead of the Transfer (Received) Date and indicates one payment as not subject to the ordinary course defense; (iii) Exhibit J – is the same data as Exhibit I, but mistakably excludes characterization of certain data and characterizes more payments as not subject to the ordinary course defense without explanation as to why; and (iv) Exhibit K – is the same data as Exhibit J (including the mistaken omission) but uses the Transfer (Deposit) Date, instead of the check date and indicates more payments as not subject to the ordinary course defense, again without explanation as to why. Given the lack of explanation, including specifically, why some payments are deemed to be "preference payments," while others are not, along with the lack of certain data on these Exhibits, they are not helpful to the Court.

13. Premium offered the Court no analysis on the difference in timing of payments from the Pre-Preference Period to the Preference Period. Rather, Mr. Couture offered only that he noticed some delay in the receipt of payments in the Preference Period. Premium provided no

---

[2] The invoice date is the same as the shipment date pursuant to the Court's Opinion on the Trustee's Motion.

[3] Don Couture of Premium testified that Premium kept no record of the actual receipt date so this date is merely an estimation.

5

report with respect to the timing of payments, either expert or lay prior to the Court's deadlines in its Amended Scheduling Order.

14. The Trustee, through Mr. Brown offered several useful mechanisms for this Court to compare the Pre-Preference Period and the Preference Period, including the difference in average days to pay in the Pre-Preference Period to the Preference Period: 31 to 41, for a 10 day shift in timing. Mr. Brown quantified the percentage shift in timing as 32%. Mr. Brown also testified that the entire Pre-Preference range of days to pay was 11 to 52 days, whereas in the Preference Period, it was 25 to 62 days.

15. Outside of the timing of payments, but also relevant to the subjective prong of the ordinary course of business defense, Mr. Couture testified that he had communication with his contact at the Debtor during the Preference Period, and that they specifically discussed that payments on Premium's invoices were taking longer.

16. The Trustee also established, on cross-examination of Mr. Couture, that Premium and the Debtor had always operated with a contract, for each contract period, but that Premium had been unable to produce a contract for the Preference Period.

**C. § 547(c)(2)(C) / Objective Ordinary Course**

17. Premium offered the testimony of Mr. Couture as its sole attempt to meet its burden on the objective prong of ordinary course. Again, no report – expert or lay was submitted in accordance with the Court's Amended Scheduling Order.

18. The Trustee did not attempt to establish its own business terms (for the Debtor's or Premium's industry), but rather took the position that Mr. Couture was not qualified to offer this Court testimony regarding objective ordinary course, and the testimony that he provided was not specific or objective, as required under applicable authorities.

6

2386740.4

19. Attempting to establish Premium's industry, Mr. Couture indentified only three competitors of Premium, while also referring to, but failing to identify Premium's competitors that the Debtors were also buying honey from in the Preference Period, and Premium's competitors that its other customers (such as Flower Foods) were buying honey from in the Preference Period. Mr. Couture also indicated that there were numerous honey wholesalers, but failed to identify any of them by name.

20. Mr. Couture offered no specific payment terms, aging of invoices, or collection practices from competitors, or the industry as a whole (from the Preference Period or any other time period).

21. Mr. Couture testified that he has been employed with Premium since 2002, had not worked for any other company other than Premium since that time, and that most of his career he has been self employed.

22. Mr. Couture testified to his involvement with several trade associations including the Ontario Beekeepers Association, and the Honey Counsel, but he did not provide testimony regarding specific knowledge or information, for instance, on payment terms, aging of invoices, or collection practices which he obtained from his involvement in these trade associations. Mr. Courture's deposition, admitted into evidence as Plaintiff's <u>Exhibit 6</u>, clarifies that Mr. Courture's experience was limited to production and cost issues with these trade organizations, not to payment practices, which were held confidential.

### III.     CONCLUSIONS OF LAW

**A. New Value**

23. The Court previously noted in its Opinion on Premium's Motion and at trial that it would apply the subsequent value rule, that is, that new value must replenish the estate and there must be a showing that new value was provided subsequent to a Transfer.

7

24.     The Court finds that Plaintiff's New Value Chart accurately applies the subsequent value rule to the facts of this case, which relevant facts, such as the amounts of invoices, dates invoiced shipped[4], and the amounts of checks and their deposit dates[5] were already established in the Opinion on the Trustee's Motion. The Trustee's <u>Exhibit 2</u> carefully considers potential new value and the Transfers, in their appropriate chronological order. Furthermore, the preference running sum column does not carry forward surplus new value.[6]

25.     As a matter of law, and considering only the new value defense under § 547(c)(4), Premium is entitled to a new value credit in the amount of $177,360, leaving a net of new value liability of $234,880 without consideration of any other defenses.

**B. § 547(c)(2)(B) / Subjective Ordinary Course**

26.     Before the Court is evidence that there was a 10-day shift in timing from the Pre-Preference Period to the Preference Period, which equates to a 32% increase. For purposes of Premium's subjective ordinary course defense, this change in timing is significant and the Court cannot find that there is consistency in timing. Further establishing this significance is the fact that the parties went from a practice where payments were generally made later than their 15-day terms, but more than three fourths of them were still made by their 39th day.[7] Furthermore, Mr.

---

[4] As modified by the Order Correcting Clerical Mistake.

[5] The receipt date of checks is generally the relevant date for examining transfers in a new value defense. *In re Kroh Brothers*, 930 F.2d 648, 651 (8th Cir. 1991). However, here, the testimony was that Premium did not keep record of the receipt date of checks, but that Mr. Couture would normally deposit checks on the same day, but certainly no later than two business days after receipt. Accordingly, the Court is satisfied that utilizing the deposit date is the appropriate "action date" for a new value analysis.

[6] *See In re Isis Foods, Inc.*, 39 B.R. 645, 652 (Bankr. W.D. Mo. 1984*) (*stating that surplus new value may no longer be carried forward under § 547(c)(4), "as was formerly the case under the old net result rule.")*; In re Hancock-Nelson Mercantile Co., Inc.,* 122 B.R. 1006, 1015-1016 (Bankr. D. Minn. 1991); *In re Acoustiseal, Inc.*, 318 B.R. 521, 525 – 527 (W.D. Mo. 2004); *In re Interstate Bakeries Corp.*, 2011 Bankr. LEXIS 140 (Bankr. W.D. Mo. 2011) (Venters, J.); *see also In re Sharoff Food Service, Inc.*, 179 B.R. 669, 677 (Bankr. D. Colo. 1995); *In re Tennessee Chem Co.*, 159 B.R. 501, 516 (Bankr. E.D. Tenn. 1993); *In re El Paso Refinery, L.P.*, 178 B.R. 426, 450 (Bankr. W.D. Tex. 1995).

[7] Exhibit E of Plaintiff's <u>Exhibit 1</u> (Brown Report).

Brown's testimony and expert witness report indicated that 6 of the 16 invoices paid during the Preference Period, were paid later than any other invoice in the entire Pre-Preference relationship between the parties.

27.    Although the cornerstone of subjective ordinary course is the timing of payments, this Court must also consider other evidence that was adduced at trial and bears on Premium's subjective ordinary course defense, namely collection efforts and unusual activities. "Among the factors courts consider in determining whether transfer are ordinary in relation to past practices between the debtor and the transferee creditor are… whether the debtor or creditor engaged in any unusual collection or payment activity."[8]

28.    "The burden is on the defendant to establish the absence of unusual collection activity."[9] Because the only evidence offered at trial was that Mr. Couture spoke with his contact at the Debtor, and they discussed the slowness of payments, and no evidence was presented that this was usual (for instance that the Mr. Couture and his debtor contact generally discussed timing of payment), the Court must consider this communication in its determination regarding subjective ordinary course.

29.    The Trustee also adduced testimony that Premium had always operated under a contract with the Debtor for several month periods of time. However, with respect to the Preference Period, Premium was unable to produce a contract, indicating that the parties operated without a contract in the Preference Period, which indicates an alteration in the parties'

---

[8] *Central Hardware Co., Inc. v. The Walker-Williams Lumber Co. (In re Spirit Holding Co., Inc.),* 241 B.R. 891, 897 (E.D. Mo. 1997) *aff'd* 153 F.3d 902 (8th Cir. 1998).

[9] *U.S. Bank NA v. SMF Energy Corp. (In re Interstate Corp.),* 09-4177 (Jan. 12, 2011), *aff'd* 460 B.R. 222 (8th Cir. B.A.P. 2011), *aff'd* in a *per curiam* unpublished decision (8th Cir. Aug. 2, 2012), *citing Jacobs v. Matrix Capital Bank (In re AppOnline.com, Inc.),* 315 B.R. 259, 284 (Bankr. E.D.N.Y. 2004).

9

relationship. Like collection activity, the Court will consider this activity in making its determination regarding subjective ordinary course.[10]

30. The Court has carefully reviewed Exhibit E to Plaintiff's <u>Exhibit 1</u> (Brown Report), that Mr. Brown testified to at trial. Mr. Brown explained that he selected three points in the Pre-Preference Period and compared them to the Preference Period as follows:

Day 39 – Pre-Preference Period, 76% of all invoices paid; Preference Period, 44%

Day 47 – Pre-Preference Period, 98% of all invoices paid; Preference Period, 50%

Day 52 – Pre-Preference Period, 100% of all invoices paid; Preference Period, 63%

31. These three comparisons correspond with Plaintiff's <u>Exhibits 3-5</u>, admitted by this Court, which the Plaintiff described as charts overlaying Premium's new value and subjective ordinary course of business defenses. In other words, <u>Exhibit 3</u> offers a protective window for ordinary course of 0-39 days, <u>Exhibit 4</u>, offers a protective window of 0 – 47 days, and <u>Exhibit 5</u> offers a protective window of 0-52 days. The Court has reviewed these three exhibits and finds that they are in conformity with § 547(c)(4) and § 547(c)(2)(B) in that they do not allow Premium a credit under § 547(c)(2)(B), where it has already received a credit under § 547(c)(4) for the same invoice.[11]

32. In the absence of collection efforts and the unusual activity, the Court would be inclined to select either the Day 47 or Day 52 comparisons, as they are more closely in line with the bankruptcy court's finding in *Official Unsecured Creditors Committee v. Expeditors International of Washington, Inc. (In re Gateway Pacific Corp.)*, 205 B.R. 164, 168 (E.D. Mo.

---

[10] *In re Spirit Holding Co., Inc.,* 214 B.R. 891, 896-898 (E.D. Mo. 1997); *see also In re Furrs Supermarkets, Inc.*, 296 B.R. 33, 39-40 (Bankr. N.M. 2003).

[11] § 547(c)(4)(B) ("on account of which new value the debtor *did not make an otherwise unavoidable transfer* to or for the benefit of such creditor." (emphasis added)); *In re SGSM Acquisition Company, LLC*, 439 F.3d 233, 242 fn7; *IRFM Inc. v. Ever-Fresh Food, Co. (In re IRFM)*, 52 F.3d 288, 233.

10

1997)[12] where the court found a 54% increase in timing of payments. However, as the Court has previously noted, there are other issues which have bearing on the subjective ordinary course defense. The Eighth Circuit B.A.P has invited a weighing of subjective ordinary course factors, so that issues of timing and unusual activities may be considered collectively.[13] Taking this invitation, and considering all factors before the Court which effect Premium's subjective ordinary course defense, the Court selects a protective window of 0-39 Days to Pay (the point at which 76% of the Pre-Preference were paid) and thus selects the corresponding exhibit, Plaintiff's Exhibit 3 as determinative of the issue of Premium's new value and subjective ordinary course defense. Thus, if the Court were to find that Premium had satisfied the objective prong of ordinary course with respect to the Transfers, it would still be required to enter a judgment against Premium in the amount of $202,144, the net of liability amount properly calculated in Plaintiff's Exhibit 3.

**C. § 547(c)(2)(C) / Objective Ordinary Course**

33.    This Court previously noted in its Opinion on Premium's Motion that its is bound by the decision of *In re U.S.A. Inns of Eureka Springs, Arkansas, Inc.*, 9 F.3d 680 (8th Cir. 1993), which decision indicates that the industry for which the defendant should establish ordinary business terms, is the creditor/defendant's industry and not the debtor's industry.

34.    In general terms, § 547(c)(2)(C) requires the defendant to establish the broad range of terms in the creditor's industry.[14]

35.    More specifically, various courts have offered requirements for determining whether a witness is qualified and his or her testimony is reliable and sufficient to meet the

---

[12] *Aff'd* 214 B.R. 870 (8th Cir. B.A.P. 1997) and 153 F. 3d 915 (8th Cir. 1998).

[13] *Concast Canada, Inc. v. Laclede Steel Co. (In re Laclede Steel Co.),* 271 BR 127, 132 (8th Cir. B.A.P. 2002).

[14] *Id.*

11

objective prong of ordinary course. Furthermore, while employees may testify, testifying employees must demonstrate certain additional requirements, as will be addressed below.

36. The Trustee's briefing summarizes these various requirements for testimony with respect to the objective prong as follows:

a. The witness must specifically acknowledge the names of competitors that they are relying on for their assertions.[15]

b. The witness's testimony must be based on "specific data,"[16] for instance, introduction of evidence on competitors' receivable and collection practices.[17] "A creditor's evidence on the 'ordinary business terms' may not be vague and must be based on personal first-hand knowledge *gained from exposure to the competitors' collections practices during or near the preference period*."[18]

c. "An employee-witness testifying in support of the objective requirement of § 547(c)(2) must have some experience outside of his or her current employment in the industry, or at least have knowledge gained from industry seminars or workshops. When a witness's testimony covers only that employee's own subjective experiences, that is 'insufficient by itself to establish the range of terms prevailing within the industry as required by § 547(c)(2)(C)."[19]

---

[15] *In re Spirit Holding Co., Inc.,* 214 B.R. 891, 901 (E.D. Mo. 1997).

[16] *In re Spirit Holding Co., Inc.,* 214 B.R. 891, 901 (E.D. Mo. 1997) citing *In re Schwinn Bicycle Co.* 205 B.R. 557, 573 (Bankr. ND Ill. 1997).

[17] *See Id.* again *citing In re Schwinn Bicycle Co.,* at 573, and also *citing In the Matter of Tolona Pizza Products Corp.,* at 1033; *Solow v. Ogletree, Deakins, Nash, Smoak & Stewart,* 180 B.R. 1009, 1016 (Bankr.N.D.Ill.1995); *Luper v. Columbia Gas of Ohio, Inc.,* 91 F.3d 811, 814 (6th Cir.1996).

[18] *In re Schwinn Bicycle Co.* 205 B.R. at 573, *citing Midway Airlines,* 69 F.3d 792, 799 (7th Cir. 1995) (emphasis added).

[19] *U.S. Bank NA v. SMF Energy Corp. (In re Interstate Corp.*), 09-4177 (Jan. 12, 2011), *aff'd* 460 B.R. 222 (8th Cir. B.A.P. 2011), *aff'd* in a *per curiam* unpublished decision (8th Cir. Aug. 2, 2012), *citing In re Spirit Holding Co., Inc.*, 214 B.R. at 901 and *In re Accessair, Inc.*, 314 B.R. at 395.

2386740.4

    d. Above all, "[i]t is clear that Section 547(c)(2)(C) requires *objective specific* evidence that the disputed payment is 'ordinary' in relation to the prevailing standards in the creditor's industry."[20]

37. Because these requirements are well founded in the law, the Court expressly adopts them here.

38. Applying these requirements to the facts here, the Court finds:

    a. The witness identified three specific competitors, including Odem, Sunland and Goettie. However, the witness indicated that there were other smaller competitors, and that there were at least 15 major US wholesalers and 3-4 major Canadian wholesalers, but failed to identify any of these wholesalers. The witness also offered testimony that he was aware that his two primary customers during the Preference Period – the Debtor and Flowers Foods – utilized competitors of Premium, but failed to identify these competitors. Accordingly, the Court is not satisfied that Mr. Couture has specific enough knowledge of the competitors within Premium's industry.

    b. More concerning, was the witness's complete failure to identify "specific data" and "objective specific" evidence of any competitors' payment or collection practices, at any time, but specifically during the Preference Period. Certainly, if Mr. Couture was adequately equipped to address the objective and specific terms of the industry, it should have been presented to the Court in the form of a report. At a minimum, the witness could have presented basic framework on the industry with his telephonic testimony (e.g. how competitors bill their customers, the average age of invoices before they are paid, and how long competitors wait before taking collection actions,

---

[20] *In re Spirit Holding Co., Inc.*, 214 B.R. 981, 901 (E.D. Mo. 1997) (emphasis added).

including turning accounts over to outside credit agencies), but there was absolutely none.

c. To the extent that Mr. Couture would have offered any specific data or evidence regarding the industry's practices, it was clear that any of his knowledge of these practices would have come subjectively, that is, from his experiences as the sole employee and principal of Premium. His testimony was that he ran Premium since 2002, well prior to the start of the Preference Period, that he had not worked for anyone else during that time, and that he has been self-employed for virtually his entire career. Mr. Couture spent a significant amount of time attempting to address his involvement in various trade associations, including the Ontario Beekeepers Association, the Honey Counsel, and so forth, attempting to show the objectivity of his testimony. However, the Court finds that Mr. Couture's involvement with these trade associations does not indicate objectivity. His testimony was not specific, but vague on the issue of what knowledge, if any, he gained from any of these trade associations which has bearing on Premium's objective ordinary course defense. For instance, Mr. Couture did not offer testimony that, from his experience at conventions, he learned that honey brokers bill their customers on terms ranging from 15-60 days, but allow customers to go more than 60-days after invoice prior to instituting collection efforts. Furthermore, there was no indication based on his testimony that Mr. Couture picked up any objective and specific information from his work with trade associations. Indeed, Mr. Couture's deposition testimony indicates that the bulk of information he received from trade associations and conventions was

14

related to honey production, management of the apiaries (such as disease control of management), and that market data was focused on yearly crop outputs and pricing.[21]

39.     It may be that Mr. Couture is knowledgeable about the honey industry, but this was not made clear to the Court, and more importantly, Mr. Couture, by written report or by his oral testimony provided absolutely no framework for which this Court could determine whether the Transfers were "made according to ordinary business terms."

40.     A defendant has the burden of establishing its affirmative defenses, including the ordinary course defense by a preponderance of the evidence and thus, establishing a sufficient evidentiary record to support its affirmative defenses.[22] Accordingly, this Court finds that Premium has failed to meet its burden with respect to § 547(c)(4)(C). Because the failure to prove any of the three elements dooms the entire defense,[23] this Court must find that Premium has no ordinary course of business defense.

41.     As previously established, Premium is entitled to a new value credit in the amount of $177,360, leaving a net of new value liability of $234,880.

**D. Pre-Judgment Interest**

42.     The Bankruptcy Code does not contain a provision controlling the award of prejudgment interest; therefore federal common law determines whether to apply prejudgment interest under a federal statute.[24]

---

[21] Plaintiff's Exhibit 6, admitted by this Court into evidence, 19:1-22:19.

[22] *Shodeen v. Airline Software, Inc. (In re Accessair, Inc.),* 314 B.R. 386, 392 (8th Cir. B.A.P. 2004).

[23] *See, e.g. In re Armstrong*, 291 F.3d 517, 527 (8th Cir. 2002).

[24] *Strauss v. Hollis (In re Matlock)*, 361 B.R. 879, 886 (Banrk. W.D. Mo. 2007) *citing In re Broadview Lumber Co., Inc.*, 168 B.R. 941, 965 (Banrk. W.D. Mo. 1994).

43. Under federal common law, the prevailing party is entitled to pre-judgment interest from the date of demand, where the amount of the recovery is liquidated and ascertainable.[25]

44. "Prejudgment interest on a preferential transfer is recoverable from the date the transfer was demanded, unless there is a sound reason otherwise."[26]

45. The amount of the Transfers, net of a new value credit was easily ascertainable here, and Premium has not given the Court any cognizable reason why prejudgment interest should not be awarded.[27]

46. The Court will award the Trustee prejudgment interest on $234,880 from September 9, 2009 (the date the complaint was filed) to the date of collection, at the current rate set forth in 28 U.S.C. § 1961, which is 0.14%. For sake of clarity, the Court calculates pre-judgment interest as of April 17, 2013 at $1,188.59.

## IV.   CONCLUSION

For the reasons set forth above, the Court finds that $234,880 of the Transfers are avoidable as a preference under 11 U.S.C. § 547 and that the Trustee is entitled to pre-judgment interest. Accordingly, the Court will enter a judgment against Premium in the amount of $234,880, plus interest in the amount of $1,888.59, which interest shall continue to accrue after April 17, 2013, at the rate of 0.14% until the judgment is paid in full. A separate and consistent clerk's order will be entered. Plaintiff shall serve notice of this Judgment.

---

[25] *Id.*

[26] *Id.*, quoting 5 Collier on Bankruptcy ¶ 547.15, p. 547-132 (15th ed. Rev. 2006).

[27] *Id.*

2386740.4

Dated: April __, 2013

_____
Honorable Judge Cynthia Norton

Respectfully Submitted:

*/s/ Brendan McPherson*_____
Paul D. Sinclair (Missouri Bar No. 26732)
Dennis D. Palmer (Missouri Bar No. 21499)
Andrew J. Nazar (Missouri Bar No. 57928)
Brendan McPherson (Missouri Bar No. 60428)
POLSINELLI SHUGHART, P.C.
120 W. 12th Street, Suite 1700
Kansas City, MO  64105
Telephone (816) 421-3355
Facsimile (816) 374-0509
e-mail:  psinclair@polsinelli.com
Attorneys for the Plaintiff