**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**KANSAS CITY DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| INTERSTATE BAKERIES | ) Case No. 04-45814-can |
| CORPORATION, et al., | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) |
| | ) |
| US BANK NATIONAL ASSOCIATION, in | ) |
| its capacity as Trustee of the IBC | ) |
| CREDITOR'S TRUST, | ) |
| | ) Original Adversary Proceeding No. 06-04191 |
| Plaintiffs, | ) |
| | ) |
| v. | ) Bifurcated Adversary Proceeding No. 09-04205 |
| | ) |
| Petro Commercial Services Inc., et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

On the 10th day of April 2013, the Court heard opening statements and took evidence on

the remaining unresolved issues with respect to the claims of Plaintiff, US Bank National

Association, in its capacity as trustee (the "Trustee" or "Plaintiff") of the IBC Creditors' Trust

(the "Trust") against Defendant, Premium Food Sales, Inc. ("Premium"). Plaintiff appeared by

and through its counsel, Andrew J. Nazar and Brendan L. McPherson of Polsinelli Shughart PC,

and in person through W. Terrence Brown, a member of the Trust's Trust Advisory Board.

Premium appeared by and through its counsel, Jeannie M. Bobrink and James F. Freeman of

Swanson Midgley, LLC and by telephone[1] through Donald Couture, its principal, with Irvin

Schein, Premium's Canadian counsel. There were no other appearances.

The Court, after reviewing the Memorandum Opinion of the Honorable Jerry W. Venters,

now retired, (Docket No. 97) (the "Opinion on the Trustee's Motion"), the Memorandum

Opinion of this Court (Docket No. 123) (the "Opinion on Premium's Motion"), Plaintiff's Trial

Brief and Motion in Limine (Docket No. 113), Premium's Suggestions in Support of Motion and

suggestions in Support of Disallowance of Interest both pre-and post judgment and Extraordinary

means of collection (Docket No. 124), the Order on Plaintiff's Motion to Correct Clerical

Mistake, (Docket No. 125) (the "Order Correcting Clerical Mistake"), the Stipulation regarding

admissibility of certain exhibits (Docket No. 128), reviewing the Court file, hearing the

statements of counsel, considering the admitted exhibits and testimony and credibility of the

witnesses, and being otherwise duly advised in the premises, FINDS, ORDERS AND

ADJUDGES as follows:

## PROCEDURAL BACKGROUND

1.    The procedural background with respect to the Chapter 11 filing of Interstate

Bakeries Corporation and related debtors (collectively, the "Debtor" or "IBC"), the creation of

the Trust, and the filing of the Trustee's original and bifurcated adversary proceedings to recover

alleged preferential transfers against various defendants is set forth in a related matter, *U.S. Bank

National Association v. SMF Energy Corporation (In re Interstate Bakeries Corp.),* 460 B.R. 222

(B.A.P. 8th Cir. 2011) and need not be repeated here. This adversary is the last of approximately

240 avoidance actions filed in connection with the IBC case.

---

[1] The Court allowed Mr. Couture to testify by phone and he was sworn in on the record by a court reporter in the room with him. Mr. Schein, Premium's attorney, established it was Mr. Couture speaking, and Trustee consented to the procedure.

2.      The Trustee filed its bifurcated complaint in this Adversary against six unrelated defendants on September 14, 2009. The Trustee has dismissed or taken judgment against five of the defendants, leaving only the transfers from the Debtor to Premium at issue.

3.      In particular, the Trustee seeks to recover a portion of $412,240.00 in allegedly preferential transfers (the "Transfers") that the Debtor made to Premium in the 90 days before the Debtor's bankruptcy petition date.

4.      Following the Trustee's Motion for Partial Summary Judgment (Docket No. 82) and briefing on the matter, the Honorable Jerry W. Venters, now retired, entered his Opinion on the Trustee's Motion, granting the Trustee's Motion "in all respects." Specifically, Judge Venters found:

> The uncontroverted facts establish judgment as a matter of law that: 1) the Transfers are avoidable under 11 U.S.C. § 547(b); 2) Premium cannot shield the Transfers from avoidance under § 547(c)(1); 3) Premium's ability to shield the Transfers from avoidance under § 547(c)(2) and (c)(4) will be determined at the trial… and 4) any credit for new value will be calculated using the delivery dates and amounts set forth in numbered paragraph 7 [of the Opinion].

5.      Before trial, Premium moved for summary judgment with respect to its defenses. This Court denied Premium's Motion in the Opinion on Premium's Motion, and this matter proceeded to trial on Premium's §§ 547(c)(2) and (c)(4) defenses. The Court's Opinion on Premium's Motion outlines much of the relevant and binding law with respect to Premium's §§ 547(c)(2) and (c)(4) defenses.

6.      In the Court's Opinion on Premium's Motion, the Court determined that, to prevail on its ordinary course of business defense under § 547(c)(2), Premium must meet all three prongs of the pre-BAPCPA version of § 547(c)(2).[2] The Court determined that the Trustee

---

[2] Premium had conceded that the pre-BAPCPA law applied to this Adversary, since the IBC Chapter 11 case was filed prior to BAPCPA's effective date.

had conceded that Premium established the first prong under subsection (A), i.e., that the debt was incurred in the ordinary course of Premium's and the Debtor's business or financial affairs.

7.    The Court also granted the Plaintiff's motion for Order Correcting Clerical Mistake, which modified and corrected the chart in Paragraph 7 in the Court's previous Opinion on Trustee's Motion affecting the new value defense asserted by Premium.

## FINDINGS OF FACT

### § 547(c)(2)(B) / Subjective Ordinary Course

8.    Prior to trial, the parties agreed on a Joint Stipulation (Docket No. 128). In the Stipulation, the parties agreed on data relating to the timing of payments for both the 90-day preference period (the "Preference Period") and the approximate nine month period of time prior to the Preference Period (the "Pre-Preference Period").

9.    Premium's only witness, Mr. Couture, identified and addressed briefly Premium's various exhibits that related to Preference Period and Pre-Preference Period data, including Premium's Exhibits A, C, and H - K. The Court admitted each of these exhibits.

10.    The Trustee's only witness, Mr. Brown, identified and addressed Preference Period and Pre-Preference Period data from his Expert Witness Report, admitted by this Court as Exhibit 1. The Court did not find that Mr. Brown was an "expert," however, but that his testimony related to a summary of dates and calculations was helpful to the Court and therefore should be admitted in that light.

11.    The Court finds that the substance of the data from the parties' competing exhibits and the Joint Stipulation is the same. The only difference in presentation of this data was the "days to pay" or "payment gap" data. The Trustee's presentation of this data, through its witness

4

Mr. Brown, was calculated from the invoice date[3] to the deposit date of a check by Premium.

Premium, in its Exhibit C, presented a "payment gap" from the invoice due date (i.e. 15 days

from the invoice/shipment date) to the check date and the deposit date.

12.    Premium's presentation and analysis of this data was based on several iterations:

(i) Exhibit H – is a combination of new value and ordinary course analysis, using the Transfer

(Received) Date which Premium estimated based on a two day subtraction of the deposit date of

the checks[4] and mistakenly uses the wrong action date to organize its data; (ii) Exhibit I – is the

same data as Exhibit H, but uses the Transfer Date (i.e. Check Date) instead of the Transfer

(Received) Date and indicates one payment as not subject to the ordinary course defense; (iii)

Exhibit J – is the same data as Exhibit I, but mistakably excludes characterization of certain data

and characterizes more payments as not subject to the ordinary course defense without

explanation as to why; and (iv) Exhibit K – is the same data as Exhibit J (including the mistaken

omission) but uses the Transfer (Deposit) Date, instead of the check date and indicates more

payments as not subject to the ordinary course defense, again without explanation as to why.

13.    It was apparent that Premium's charts were prepared by Premium's counsel, and

that Mr. Couture did not have actual knowledge of the assumptions or methodology used to

prepare the charts.

14.    Given the lack of explanation, including specifically why Premium deemed some

payments to be "preference payments," while others are not, along with the lack of certain data

on Premium's charts, the Court finds that Premium's charts are not helpful to the Court.

---

[3] The invoice date is the same as the shipment date pursuant to the Court's Opinion on the Trustee's Motion.

[4] Don Couture of Premium testified that Premium kept no record of the actual receipt date so this date is merely an estimation.

15.     Premium offered the Court no analysis on the difference in timing of payments from the Pre-Preference Period to the Preference Period. Rather, Mr. Couture offered only that he noticed some delay in the receipt of payments in the Preference Period. Premium provided no report with respect to the timing of payments, either expert or lay, prior to the Court's deadlines in its Amended Scheduling Order.

16.     The Trustee, through Mr. Brown, offered several useful mechanisms for this Court to compare the Pre-Preference Period and the Preference Period, including the difference in average days to pay in the Pre-Preference Period to the Preference Period: 31 to 41, for a 10 day shift in timing. Mr. Brown quantified the percentage shift in timing as 32 %. Mr. Brown also testified that the entire Pre-Preference range of days to pay was 11 to 52 days, whereas in the Preference Period, it was 25 to 62 days.

17.     Although Premium's charts are not helpful to the Court with respect to whether the Transfers were subjectively ordinary, the Court did find helpful the credible testimony of Mr. Couture.

18.     Mr. Couture testified that he is the sole full-time employee of Premium, and that Premium is a honey broker based in Toronto, Canada. He stated that there are only 3 or 4 honey brokers such as Premium in Canada, perhaps 50 wholesalers in the United States, and that they are generally small, family run businesses.

19.     Mr. Couture testified that Premium operated under quarterly contracts with its customers, including the Debtor.[5] Premium quoted honey prices to the Debtor's individual bakeries. The bakeries, through the Debtor, then contracted to buy honey from Premium on an

_____

[5] Premium offered evidence of prior contracts with the Debtor but did not have a record of a contract with the Debtor during the Preference Period. Mr. Couture testified that he was certain there was a contract in place but that the record had been inadvertently lost or destroyed prior to litigation. The Court found Mr. Couture's testimony believable. Even without Mr. Couture's testimony, as discussed below, the physical contract itself is not dispositive or arguably relevant to the Court's ordinary course of business analysis.

as-needed basis at the set price for the quarter. The Debtor called or faxed a request for honey to Premium, Premium contacted a warehouse to ship the honey, and with the shipment Premium issued an invoice. Premium had been doing business with Debtor since sometime in 2003, and the exhibits reflect numerous transactions between September 2003 through the Preference Period and even after the date of filing.

20.     Premium's invoices with the Debtor provided for payment on a "net 15 days" basis.

21.     Premium and the Debtor did not follow the invoice terms.

22.     Payment times varied, according to the information presented in both parties' exhibits.

23.     Mr. Couture did not keep a record of when Premium received checks from the Debtor, but Mr. Couture usually deposited the check the day they arrived, unless it was a weekend.

24.     Mr. Couture acknowledged at trial that, during the Preference Period, Debtor's payments were later than they were in the Pre-Preference Period, but not so significantly later that he made payment demands or had concerns. He testified that during the Preference Period, the invoices were sent to the Debtor's headquarters instead of the Debtor's regional bakeries, so he presumed that was the reason for the delay. Mr. Couture believed the payments were later because of Debtor's change to a centralized payment system.

25.     Specifically, throughout the course of Debtor's and Premium's business relationship, Debtor's payments to Premium were, on average, made in 31 days during the Pre-Preference period.

26.     During the Preference Period, the payments were, on average, made within 41 days, an increase of 32 %, according to Mr. Brown's testimony and the Court's own calculations.

27.     Although Mr. Couture communicated with the Debtor during the Preference Period about the longer period of time it was taking for payment, such communication would be expected and not unusual when a company changes its payment practices.

28.     The Court finds Mr. Couture's testimony that he did not make payment or collection demands on the Debtor during the Preference Period to be credible. Plaintiff, on the other hand, produced no evidence of collection efforts or threats by Premium during the Preference Period or otherwise, and there is no evidence that Premium took advantage of or was even aware of Debtor's deteriorating financial condition.

29.     Thus, throughout the course of what the Court finds to be their longstanding relationship, the Debtor consistently made late payments to Premium, despite the fact that the terms of the contract were "net 15." The form and tender and varying amounts of the payments did not change and were the same during the Pre-Preference and Preference Periods.

30.     The Court finds that Debtor and Premium did not follow the invoice terms; that the Debtor's payments to Premium were always generally late, such that late payments constituted the ordinary course of business between the parties. Although the payments were slightly later during the Preference Period, the 10-day shift in lateness was not so late or inconsistent that it rendered the payments outside the ordinary course. Rather, the Court finds as a factual matter that the payments were made in the ordinary course of the business of the Debtor and Premium.

**§ 547(c)(2)(C) / Objective Ordinary Course**

31.     Premium offered the testimony of Mr. Couture as the only evidence in support of its burden on the objective prong of ordinary course.

32.     Mr. Couture testified as to his experience within the honey business and specifically, the honey broker business. His educational background was in entomology and apiaries. He started his first honey buying business in 1988. He is a member of multiple trade associations and attends trade conventions where he discusses beekeeping practices with others in the industry.

33.     Mr. Couture is an expert qualified by knowledge and experience with respect to the daily operations of the honey brokering business and beekeeping.

34.     Premium did not meet its burden to prove that the Transactions were objectively within the ordinary course of the honey brokering business.

35.     Mr. Couture's testimony about payment terms in the honey brokering business, while credible, was not based on personal knowledge of any businesses other than his own, and was not based on knowledge of the industry at the time of the Transactions.

36.     Mr. Couture is not an expert qualified by knowledge or experience with respect to whether the payments at issue were made according to ordinary business terms of similarly situated members in the industry facing the same problem.

37.     Attempting to establish Premium's industry, Mr. Couture identified only three competitors of Premium, while also referring to, but failing to identify Premium's competitors that the Debtors were also buying honey from in the Preference Period, and Premium's competitors that its other customers (such as Flower Foods) were buying honey from in the Preference Period. Mr. Couture also indicated that there were numerous honey wholesalers, but failed to identify any of them by name.

38.     Mr. Couture offered no specific payment terms, aging of invoices, or collection practices from competitors, or the industry as a whole (from the Preference Period or any other time period).

39.     Mr. Couture testified that he has been employed with Premium since 2002, had not worked for any other company other than Premium since that time, and that most of his career he has been self-employed.

40.     Mr. Couture testified to his involvement with several trade associations including the Ontario Beekeepers Association and the Honey Counsel, but he did not provide testimony regarding specific knowledge or information, for instance, on payment terms, aging of invoices, or collection practices which he obtained from his involvement in these trade associations.  Mr. Couture's deposition, admitted into evidence as Plaintiff's Exhibit 6, clarifies that Mr. Couture's experience was limited to production and cost issues with these trade organizations, not to payment practices, which were held confidential.

41.     Mr. Couture did not have any experience in the baking industry outside of his dealings with his customers such as the Debtor.

42.     Mr. Couture testified at his deposition that he had talked to other honey brokers in an effort to investigate bakery industry payment standards, but such efforts occurred after the Preference period and in connection with this litigation.

43.     Premium did not submit an expert report regarding Mr Couture's testimony as an expert in accordance with Rule 26 in accordance with the Court's scheduling order. At trial, when Premium's counsel attempted to elicit such expert testimony, counsel for Plaintiff objected. The Court pointed out the failure to submit a report but indicated she would give counsel for Premium some leeway. Counsel for Premium chose instead to withdraw the line of questioning,

and therefore did not qualify Mr. Couture as an expert with respect to ordinary business terms in the honey brokering industry.

44.    The evidence related to whether Mr. Couture could testify as an expert with respect to whether the payments were made according to ordinary business terms of similarly situated members in the industry facing the same problems thus comes in through the stipulated use of the deposition transcript.

45.    Despite his otherwise credible testimony, Mr. Couture did not testify based on any personal knowledge, experience or training as either an expert or lay witness of similarly situated members of the honey brokering business with respect to what the standard for ordinary business payment terms were at the time of the payments at issue.

46.    Mr. Couture did not have any knowledge, experience or training as either an expert or lay witness about ordinary business payment terms in the baking industry at the time of the payments at issue.

47.    At the close of Mr. Couture's testimony, Plaintiff orally moved for a directed verdict on the grounds that the Defendant did not offer any evidence regarding the objective prong, but the Court denied the motion. The motion is now moot based on the Court's written ruling.

48.    As a factual matter, the payments Debtor made to Premium during the Preference Period were not made according to ordinary business terms.

**New Value**

48.    With respect to Premium's new value defense under § 547(c)(4), the Court admitted Plaintiff's Exhibit 2, a chart titled "New Value Analysis (with no Ordinary Course Defense Considered)" ("Plaintiff's New Value Chart").

49.      Although the Court admitted by agreement four charts presented by Premium, based on the Court's review of these charts,[6] and the testimony of Mr. Couture, the Court finds that none of Premium's charts adequately address Premium's new value argument. Accordingly, Premium has offered this Court no evidence of the discount it is entitled to receive solely under the new value defense.

50.      Rather, the Court adopts and incorporates Plaintiff's New Value Chart (Exhibit 2).

51.      Plaintiff's New Value Chart establishes that, during the Preference Period, Premium provided new value to the Debtor of $177,360.

52.      Premium's Exhibit H, a chart purporting to establish Premium's evidence of new value, contains an analysis of new value in a column titled "Amount of New Value," with the amounts highlighted in yellow. Those amounts correspond to the "Amount of New Value" on Plaintiff's Exhibit 2.

53.      The net preferential transfers Debtor made to Premium during the Preference Period that are avoidable thus total $234,880 (total payments of $412,240 minus $177,360 new value credit).

## CONCLUSIONS OF LAW

### § 547(c)(2) - Ordinary Course

To succeed in its ordinary course defense, Premium bore the burden of proving all three elements of the prior version of § 547(c)(2), that the transfer was --

(A)      in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

---

[6] Premium did not submit its exhibits to the Court in advance of the trial, so the Court had no opportunity to review Premium's charts before the hearing.

(B)      made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C)      made according to ordinary business terms.

Courts must construe the defense narrowly, as it puts one creditor "on better footing than all other creditors." *In re Armstrong*, 291 F.3d 517, 527 (8th Cir. 2002). To succeed, a defendant must prove each element by a preponderance of the evidence. 291 F.3d at 526.

The Trustee conceded that the first element was met. The Court concludes as a matter of law that Premium met its burden of establishing the second "subjective" element but failed its burden of establishing the third "objective" element. Therefore, as explained below, Premium does not have an ordinary course defense so as to render the Transfers unavoidable.

### *§ 547(c)(2)(B) - Made In the Ordinary Course – Subjective Element*

The second element of the ordinary course defense is frequently referred to as the "subjective" element because it requires Courts to "engage in a 'peculiarly factual analysis.'" *In re Lovett*, 931 F.2d 494, 497 (8th Cir. 1991) (cites omitted). "The cornerstone of this element of a preference defense is that the creditor needs to demonstrate *some consistency* with other business transactions between the debtor and the creditor." *Id.* (emphasis added).  To determine whether payments were consistent, Courts should examine factors such as: "(1) the length of time the parties were engaged in the transaction, (2) whether the amount or form of tender differed from past practices, (3) whether the debtor or the creditor engaged in any unusual collection or payment activity, and (4) whether the creditor took advantage of the debtor's deteriorating financial condition." *In re Spirit Holding Co., Inc.*, 214 B.R. 891 (E.D. Mo. 1997), *aff'd by* 153 F.3d 902 (8th Cir. 1998);  *see also Laclede Steel Co*., 271 B.R. 127, 131-32 (B.A.P. 8th Cir. 2002) (discussing the four factors and a sliding scale analysis in applying them).

13

The Eighth Circuit provides guidance to this Court on how to apply this defense through its decision in *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494 (8th Cir. 1991). In *Lovett*, the debtor made a series of payments to a freight carrier during the preference period. *Lovett*, 931 F.2d at 495. According to the contract between the parties, payments for shipments were due 30 days after the shipment. *Id*. In reality, payments were generally made about 60 days after shipment. 931 F.2d at 496. The Eighth Circuit disagreed with the District and Bankruptcy Courts in their finding that ordinary course should be determined by the contract between the parties, and instead held that "[t]he ordinary course of business . . . was the way the parties actually conducted their business dealings, not the conditions specified in the agreement that the parties in fact rarely followed." 931 F.2d at 497. If late payments were the standard course of dealing, then the court should not consider lateness alone sufficient to defeat the ordinary course defense. 931 F.2d at 498.

Instead of looking to the contract to determine the subjective standard for ordinary behavior between the parties, the *Lovett* Court looked to the parties' payment history during the 12 months before the preference period and compared it to that during the preference period. *Id*. During the pre-preference period, the payments were made, on average, within 62 days of the shipment. *Id*. During the preference period, the average was 52 days. *Id*. The Court found this difference in payments was not significant enough to indicate that the payments were outside the ordinary course of business. *Id*.

Subsequent cases have examined fact patterns to determine when late payments are so late as to fall outside the subjective ordinary business practices of frequently late-paying debtors. Late payments during the preference period will not be subjectively ordinary if the payments during the preference period are "substantially later." *In re Accessair*, 314 B.R. 386 (8th Cir.

14

2004). In *Accessair*¸ the Court held that when the amount of time it took the debtor to pay increased during the preference period as compared with the pre-preference period by 294 %, the payments were substantially late enough to be outside the ordinary course. Similarly, in *Gateway Pacific*, the Court found late payments to be not within the subjective ordinary course when the payments were on average 19 days later during the preference period. *In re Gateway Pacific Corp.*, 214 B.R. 870, 875 (8th Cir. 1997). In addition, the Court in *Gateway Pacific* found persuasive that during the pre-preference period, nine out of 155 payments were more than 50 days old, while during the preference period 24 out of 28 were. *Id*.

As in *Lovett*, the subjective ordinary course of business between Premium and the Debtor was for the Debtor to pay late. Mr. Couture testified that he believed the Debtor never paid on time. Evidence provided by the parties' shows that payments were, on average, made 31 days after an invoice was issued during the pre-preference period (16 days after the invoices were due) and 41 days post-invoice during the preference period (26 days after the invoices became due). The question is whether the 10-day increase was substantial. The payment gap in this case is exactly the same as *Lovett*, where the Court found that a 10-day change in payments did not mean the payments were outside the subjective ordinary course. Similarly, the increase in tardiness of the payments is 32 % is not substantial: it is significantly lower than the 54 % increase in *Gateway Pacific* or the 254 % increase in *Accessair*.  This payment difference, then, without more, is not substantial enough to warrant finding the payments were outside the subjective ordinary course of business between Premium and the Debtor.

The Trustee argues that there is more here -- that Premium engaged in "unusual collection activity." The Court, however, is not convinced. To be "unusual," Courts typically require some evidence of the creditor putting "economic pressure" on the debtor to pay. *Lovett*,

931 F.2d at 499; *see Accessair*, 314 B.R. at 394. While *Lovett* acknowledges that "the burden is on the defendant to prove the absence of unusual collection activity," the Court also notes that "it is hardly unusual for a creditor to urge its debtor to pay more promptly." *Lovett*, 931 F.2d at 499.

The alleged "collection activity" took place during one of the monthly phone calls between Mr. Couture and the Debtor. During the call, Mr. Couture discussed with the Debtor's representative recent changes in the billing practices. Mr. Couture mentioned that the payments were later but did not think they were substantially so. He testified that he did not demand payments or threaten to stop delivering product if the invoices remained unpaid. The Court, again, finds his testimony credible.

When considering the other factors, such as the length of Premium's relationship with the Debtor, that the form and amounts of payments during the relationship did not change, and that there is no evidence Premium took advantage of the Debtor, the Court concludes as a matter of law that the 10-day shift in lateness during the Preference Period alone is not sufficient to deem the payments subjectively outside the ordinary course. Rather, the Court is satisfied that Premium met its burden of proving that the Transfers were made in the ordinary course of the business affairs of Premium and the Debtor within the meaning of the applicable version of § 547(c)(2)(B).

### § 547(c)(2)(C) - *Made According to Ordinary Business Terms – Objective Element*

There is no question that, under the current Bankruptcy Code, Premium would have been able to establish an ordinary course defense. Perhaps it is cases like these that show why Congress changed the law. Unfortunately for Premium, however, the Court is duty bound to follow the pre-BAPCPA law, and under that law, Premium has simply not met its burden.

Section 547(c)(2)(B) requires the creditor to prove that the transactions were made in accordance with the ordinary terms of the relevant industry. *In re U.S.A. Inns of Eureka Springs, Inc.*, 9 F.3d 680 (8th Cir. 1993). It requires a creditor to establish "the existence of some uniform set of business terms within the industry." 9 F.3d at 685. The creditor must provide evidence of the "prevailing practice among similarly situated members of the industry facing the same or similar problems." *Id.* The prevailing industry is that of the creditor.[7] *Id.*

To satisfy its burden, the creditor must provide evidence regarding the practices of the creditor's competitors. *Spirit Holding*, 214 B.R. at 899. An employee can establish the prevailing industry standards, but the employee must be able to testify *objectively* about those standards. *Accessair*, 314 B.R. at 394. For example, in *Lovett*, the creditor was able to satisfy its burden with testimony from two of its officials about common industry practices. *Lovett*, 931 F.2d at 499. In *Accessair*, the creditor was unable to meet its burden when the only testimony introduced discussed the creditor's subjective experience with other customers. *Accessair*, 314 B.R. at 394. Finally, in *Eureka Springs*, the creditor, a savings and loan, met its burden by introducing testimony of the company's president asserting that it was common practice in the industry to work with delinquent customers provided they continued paying and that the Office of Thrift Supervision directed the savings and loan to work with customers in accordance to industry-wide standards. *Eureka Springs*, 9 F.3d at 685.

---

[7] The Court recognizes that in *Accessair* the Eighth Circuit analyzed § 547(c)(2)(C) by looking at the prevailing practices in the debtor's industry. 314 B.R. at 394. In doing so, the Court cited *Eureka Springs* for the rule that the proper industry to analyze is the debtor's industry, but did not discuss why it read *Eureka Springs* to hold as such, nor did the parties contest this formulation. The Court disagrees with this reading of *Eureka Springs*, particularly as in discussing the relevant industry, *Eureka Springs* cites *In re Tolana Pizza Prod. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993) which clearly uses the creditor industry analysis, as well as multiple other cases that stand for the same rule. Regardless, even under the debtor industry standard, Premium did not meet its burden as Mr. Couture testified that he had no knowledge of the baking industry.

Mr. Couture testified that he had extensive experience in the honey industry. He earned degrees in entomology and aviculture. He had worked in an apiary research station, as an apiary inspector, started two companies that brokered honey, held memberships in the Ontario Beekeepers' Association and the American Beekeepers' Association, and attended trade association meetings. Mr. Couture could not, however, testify as to any knowledge regarding how other honey brokers dealt with their customers. His knowledge was limited to his personal knowledge of honey production and Premium's interactions with other customers. This testimony does not provide the Court with objective evidence regarding the creditor's industry, or whether the payments here were made according to ordinary business terms of similarly situated members of the industry facing the same problem.

Because Mr. Couture's testimony could not provide the Court with objective evidence regarding payment terms in the honey brokering industry, and no other objective evidence was adduced, the Court concludes that Premium failed to satisfy its burden of proof that the Transfers were made in the ordinary course of business within the meaning of § 547(c)(2)(C).

**New Value Defense**

Premium also asks the Court to find that the Transfers are unavoidable on a new value theory. Under the "new value defense," the trustee may not avoid a preferential transfer made by the debtor to a transferee in exchange for unsecured new value that remained unpaid (or on account of which new value the debtor did not make an otherwise unavoidable transfer). 11 U.S.C. § 547(c)(4); *Accessair,* 314 B.R. at 395. The purpose of §  547(c) is to "encourage creditors to deal with troubled businesses in the hope of rehabilitation." *In re Kroh Bros. Development Co.*, 930 F.2d 648, 651 (8th Cir. 1991). The defense is "finely tuned to protect those creditors who, after receiving a preference, in effect return the preference to the estate by

18

providing new value." *In re Indian Capitol Distributing, Inc*., 484 B.R. 394, 414 (Bankr. N.M. 2012). Avoidable transfers such as those that occurred here will not deprive a creditor of § 547(c)(4) protection, as the transfers must be "*otherwise unavoidable*." *In re Jones Trucking*, 130 F.3d 323, 329 (8th Cir. 1998) (emphasis original).

At issue in this case is what date the Court should use to determine when the preferential transfers were made for the purposes of § 547(c)(4). In the Eighth Circuit, a transfer for the purposes of § 547(c) occurs upon the delivery of the check. *Kroh Bros.,* 930 F.2d at 650. Doing so recognizes that "creditors who ordinarily provide goods to purchasers on credit treat a payment by check as a cash transaction, and therefore ship a new order of goods upon receipt of a check." 930 F.2d at 651. If a Bankruptcy Court were to find otherwise - that the transfer was made upon the check payment - it would result in an enhancement to the bankruptcy estate from the time of the shipment (the receipt of the check) but deprive the creditor of § 547(c)(4) protection for that same shipment because the transfer does not occur until post-shipment. *Id*. In the alternative, if creditors dealing with debtors in financial distress delayed shipments while waiting for a check to clear, this could disrupt the debtor's business and force unnecessary bankruptcies. *Id*.

The Trustee, while acknowledging that under Eighth Circuit law transfers occur upon delivery, argues that the Court should use the dates the checks were deposited as the dates of the transfers because Premium did not record the dates the checks were delivered. The Court agrees. Mr. Couture testified that he generally deposited the checks on the day they were received. If he was busy, or the checks came in on a Friday afternoon, he would sometimes deposit them the following business day. Based on this testimony, the Court is not convinced, as is suggested by

Premium's counsel, that it should simply subtract two days from the deposit date to determine the transfer date when there is no testimony from Mr. Couture supporting such a measure.[8]

Rather, the Court concludes as a matter of law that Trustee's New Value Chart (Exhibit 2) accurately applies the subsequent new value rule to the facts of this case. Exhibit 2 incorporates the undisputed relevant facts or data (such as the amounts of invoices, dates invoiced shipped[9], and the amounts of checks and their deposit dates) that had already been established in the Opinion on the Trustee's Motion. The Trustee's <u>Exhibit 2</u> carefully considers potential new value and the Transfers, in their appropriate chronological order. Furthermore, the preference running sum column does not carry forward surplus new value.[10]

As a matter of law, and considering only the new value defense under § 547(c)(4), Premium is entitled to a new value credit in the amount of $177,360, leaving a net of new value liability of $234,880 without consideration of any other defenses.

### Prejudgment Interest

In its post-trial submission, the Trustee requests that the Court award prejudgment interest at the federal judgment rate of 0.14% on the sum of $234,880, from September 9, 2009,

---

[8] Even if the Court were to find that Premium's determination of delivery date had sufficient factual support, the Court finds that the only transfer that would be affected is the payment deposited on July 27, 2004 in the amount of $37,024. This would mean that the Defendant received the check on July 25, 2004, a Sunday. While the Court is well aware that many people work on Sundays, it would be unreasonable, without further proof, particularly in light of Mr. Couture's testimony that he would hold off depositing checks over the weekend, to conclude that the Defendant's place of business was open to receive mail on Sundays or that the Canadian post delivered on Sundays.

[9] As modified by the Order Correcting Clerical Mistake.

[10] *See In re Isis Foods, Inc.*, 39 B.R. 645, 652 (Bankr. W.D. Mo. 1984*) (*stating that surplus new value may no longer be carried forward under § 547(c)(4), "as was formerly the case under the old net result rule."*); In re Hancock-Nelson Mercantile Co., Inc.,* 122 B.R. 1006, 1015-1016 (Bankr. D. Minn. 1991); *In re Acoustiseal, Inc.*, 318 B.R. 521, 525 – 527 (W.D. Mo. 2004); *In re Interstate Bakeries Corp.*, 2011 Bankr. LEXIS 140 (Bankr. W.D. Mo. 2011) (Venters, J.); *see also In re Sharoff Food Service, Inc.*, 179 B.R. 669, 677 (Bankr. D. Colo. 1995); *In re Tennessee Chem Co.*, 159 B.R. 501, 516 (Bankr. E.D. Tenn. 1993); *In re El Paso Refinery, L.P.*, 178 B.R. 426, 450 (Bankr. W.D. Tex. 1995).

the date of the filing of the Adversary complaint, to the date of judgment. The Court in its discretion denies the request.

Because the Trustee's cause of action arises under a federal statute, federal law governs the allowance and rate of prejudgment interest. *In re Living Hope Southwest Medical SVCS, LLC*, 450 B.R. 139, 157 (Bankr. W.D. Ark. 2011). The Bankruptcy Code does not contain a provision controlling whether and in what amount prejudgment interest is allowed, therefore this Court must look to federal common law. *In re Matlock*, 361 B.R. 879, 886 (W.D. Mo. 2007). Federal common law permits a court to award prejudgment interest in its discretion on a preference claim "if the transferee creditor had the ability to ascertain the amount of its liability on the preference claim without judicial determination." *In re Bellanca Aircraft Corp.*, 850 F.2d 1275, 1281 (8th Cir. 1988). A trustee is not generally entitled to prepetition interest if there existed a good faith dispute as the creditor's liability. *Armstrong¸* 291 F.3d at 528.

In this case, the Trustee offered several theories for the amount of Premium's liability, eventually conceding in the summary judgment briefing that a trial would be necessary to establish Premium's liability. The Trustee submitted four exhibits at trial with different analyses of how much Premium might owe. The Trustee originally urged the Court to apply the Missouri judgment rate.  Without this Court's adjudication of its defenses, Premium could not have ascertained what it owed. Furthermore, it was the Trustee who chose to sue six unrelated defendants in one adversary proceeding, resulting in unnecessary delay of the adjudication. Even if Premium could have ascertained its liability before trial, the Court believes it would be particularly inequitable to allow the Trustee prejudgment interest from the date of filing of the complaint under these circumstances.

**CONCLUSION**

For the reasons set forth above, the Court finds that $234,880 of the Transfers are avoidable as a preference under 11 U.S.C. § 547(b). Accordingly, the Court will enter a judgment against Premium in the amount of $234,880. A separate and consistent clerk's judgment will be entered. Plaintiff shall serve notice of this Judgment.

SO ORDERED.


Dated: June 17, 2013


                                        ____/s/ Cynthia A Norton_
                                        Honorable Cynthia A Norton


Plaintiff to serve